Your Honor, this is the third case of the morning call, 2-12-0668, People's State of Illinois v. Louis Villavicencio-Serna. On behalf of the appellant, Mr. John P. Yetter. On behalf of the people, Ms. Kristen M. Schwinn. Mr. Yetter. Good morning. You may proceed. Thank you. My name is John Yetter and I do represent Mr. Villavicencio in this appeal. As in most murder trials, there are three classifications of evidence in this case. There's that evidence which tends to prove or disprove that a murder was committed. There's the circumstantial evidence which gives the big picture. And there's the evidence which does or does not connect the defendant to the murder. In this particular case, the evidence which tends to or does not tend to connect the defendant to this matter, when presented by the state, took the form primarily of testimony of Ms. Vasquez, Mr. Daddio, and Mr. Rogers. Those were the three primary witnesses the state used to connect Mr. Villavicencio. The problem is, of those three witnesses throughout the course of the investigation and the trial, the three of them make essentially eight different and conflicting statements. Just over a third of those statements connect Mr. Villavicencio to the trial. The other two-thirds or the remainder do not. And that ultimately then became the issue for the second type of evidence in this matter, the circumstantial evidence. We heard witnesses at trial who testified to what they heard and what they saw in the parking lot on the evening of the questioning. That evidence, in and of itself, is essentially split 50-50. There are no independent witnesses who see Mr. Villavicencio. There are several witnesses who testify as to- In this particular matter, I'm using the words independent to describe the Marinas' or the Rojas' people who are not alleged to have been in one or of the other cars that were brought up at the time of trial. People who do not have a, say, vested interest because they might be charged or have been charged. Although they all know each other in some sense, loosely, don't they? They don't know each other, like, as a big cohesive group. But everybody seems to know at least one other or more person who was there. I mean, it is an apartment complex where the majority of the people involved live or were dropping someone off who lived there. There are several relationships between the various witnesses. Even the Marinas' are related. One is in a relationship with Mr. Huerta's uncle. I'm sorry, I'm really bad at the family trees here. So, yeah, they do know each other, but they have different levels to address Your Honor's question. They have different levels of potential exposure. Let me go back to the theme of your, you started out with the argument. Obviously, you're pointing to some inconsistencies, some conflicts, admittedly, in the testimony of the witnesses. Yes. Isn't the credibility of the witnesses and the weight to be given to their testimony primarily a matter for the trier of fact? So how do you get over that fundamental threshold principle? Well, this court does have the responsibility to make sure that the evidence, as it reads it, comports to all of the law covering different types. So let's say Ms. Vasquez, Mr. Daddio, and Mr. Rogers can, in fact, be classified in this case as unindicted co-conspirators. They are in the car. They are a choice by a charging state's attorney away from being charged under accountability theory here. And as such, there is a standard of application, there is a standard applied to the review. Their testimony should be viewed with caution and suspicion, right? That is correct. However, as a corollary, isn't there a whole body of case law that says even the uncooperative testimony of an accomplice, when viewed through that lens, may sustain a criminal conviction, correct? It may. I believe that the difference here is that the statements of those three potential witnesses is, on its face, not credible. But what's the version? Didn't they give several versions according to your analysis? Yes. Not according to my version. According to the record. Yeah. The three of them testified to eight different possible fact scenarios. Three of those eight connected Mr. Villavicencio. Five did not. So inherently, when we're put in a situation where we have to view them with suspicion anyway, and their testimony is, frankly, all over the map. All right. Let's assume that's true, and I'm not going to jump ahead in the arguments. But I suspect, and don't ask me how I divine this, I'm not purporting to be carnatic to magnificent, but I think opposing counsel is going to get up and say, hey, wait a minute, the entire case didn't just rest on the three unindicted accomplices, okay? You've got Rojas identifying Daniel's car as the vehicle involved in the shooting, putting it there to support him. And, and this is, you know, I think a corroborating item that still would be troubling is, a few days before the murder, the defendant left what I think we'd consider an invective-laden message, a threatening message on the victim's phone, didn't he? Yes. Can't that be taken into consideration as corroboration? As to your first part of that, as to the identification of the vehicle. Right. The identification of the vehicle is faulty. The original statement of the individual, Mr. Rojas, who identifies having seen the vehicle, is he identifies a green or blue vehicle. Later, excuse me, at the impound lot, he identifies a silver vehicle, even though his recollection, he admitted at trial, was at the time that it was a green or blue vehicle. But at some point he did identify the vehicle, correct? He did identify that vehicle. In this particular case, you have witnesses who testified to an altercation which occurs in the same parking lot, contemporaneously, in a green vehicle, which is not Mr. Daddio's car. So I believe inherently there are flaws of that particular testimony. As to the second point, a witness is called at the end of the state's case. I'm sorry, I'm really terrible with names, and she's very important. Maria Marinas, who testifies that she hears the gunshots contemporaneously to a thud related to a car. She wasn't sure what the thud was, whether it was a car hitting something or someone hitting a car. That actually matches the testimony more of the other vehicle, that someone had hit their car and there's an argument or a discussion about whether or not they should get out, and I believe the words were kick the guy's ass. She hears the gunshots contemporaneously to that vehicle or to that noise which matches that vehicle. If you look at the testimony of Officer Ketlinski, it's clear how close the charges were on this as to who they were going to charge. Officer Ketlinski identifies that they spoke to the three gentlemen who were in the green vehicle and simply liked their statements better. He referred to them as sounding honest or something like that. Additionally, it's clear to the second point of your question, which is whether or not those really are the basis I make them out to be, those three statements, which I believe is your second question. Well, my second question related to the threatening phone call. Is that not some corroboration? It's fairly remote in time. It clearly shows a relationship between the two. I think it was six days. Is that that remote? Six days? Well, the remoteness could be in the eyes of the beholder. It is. But nevertheless, it was a threat to the victim. It was. Okay. Motive is not really the issue here. A motive never is in a murder trial. The state need not prove a motive.   That's the only motive that any given murder trial. Would that give them one? Yes. But it's the other three statements. I mean, it's clear. How the state valued them at trial. If you look at how hard they fought to get those videos in. Even though the videos in and of themselves, I believe, were improperly put in the way that they were. It's almost as if they forgot. That the statements made were the evidence in question and not the videos themselves. When we get down to this whole. Issue of the redacted statements. It was at best sloppily done fast forwarding through large sections of it. The video became such a focus of that. Whereas they could have, in fact, simply called the officer to say, didn't they say this? The problem with that is. Those witnesses didn't deny saying those things. So I know. And you articulated very clearly in the briefs. Did a good argument of why you believe there was some error with regard to playing all of these tapes. But let me ask you a pointed question. Didn't during the course of the trial, during the playing of the tapes, defense counsel stated. You know, judge, if you're going to allow the state to play a substantial portion of the recordings and we want the entire recordings played. Didn't he say that? Ultimately, I believe that that was said relative to one of the statements. I think he said tapes, but. So my recollection is that they're. I'm sorry. My recollection is that they're discussing Ms. Vasquez's. And there was more than one tape for her. And there was correct. There was, I believe, four actual exhibits. Three or four actual exhibits which contained her statements. But if the judge, the point being said, I mean, if the trial counsel says that with regard, even hers. Then isn't that a waiver of the air? If you invite playing of all of her statements, can you complain later? They shouldn't have been played. What I'm complaining about is that the order of the judge was not complied with. The judge ordered certain redactions made. And at the time when those redactions should have been present and presented in the court. If you recall, there's a somewhat heated exchange between the state's attorney and the trial judge in this matter. About why they wrote a 10 page brief supporting the entry of the video as opposed to doing the redactions that he asked for. And I believe that, I mean, the redactions were recorded. And instead what we get is long sections of fast forwarding because, frankly, I mean, the videos were. I forget the total number of hours that I watched them, but it was. It was long and laborious. But let me ask you, in all candor, wasn't there also a central theme of the defense and the witnesses? They had really their statements were essentially coerced. Yes. Well, then why couldn't the trial judge have reasonably felt that if you're, if the whole theme and the witnesses are claiming their entire statements were coerced. Couldn't the trial judge feel? Hey, wait a minute. The best way to have the trial judge determine that is to play the tapes in their entirety. So the trial judge can assess this claim of coercion. What's wrong with that? Ms. Vasquez, Mr. Daddio, Mr. Rogers all testified that the coercion in court occurred not on the video. Prior to the videos being made. But tangentially, wouldn't it be some evidence how they were acting, how they were answering questions as to whether or not they were in a coercive atmosphere? Is it arguably relevant to that issue? Yes, but not the specific coercion that they complained about. The complaint was, take Ms. Vasquez. She's a 16-year-old girl. She was questioned for the better part of two days. She does not have a parent present. She's not offered a parent present. The officer who is the juvenile officer in this case, who is assigned to essentially make sure that she is not coercive or uncomfortable. Even on that video, when she is crying and throwing up, doesn't go in the room and ask. I mean, there is evidence even on the videos that she is under duress. There's no explanation for why is she throwing up? Why is she crying? Was that part played? Yes. They fast-forwarded around those. It was my reading of the records. So, yes, it was depicted to the jury, or no, it was not? Yes, it was. Okay. It was my belief from reading the record that the fast-forwarding occurred. There was a long stretch of time in her statement, well, her video, where there is essentially nothing going on. And they fast-forwarded through parts where she's sitting. Did they get all of the crying? I don't know. They did get the vomiting and the major portions of crying. It's hard to tell from reading whether they got every instance of expressing her duress. I'm sorry, did I? Yes. Does that answer your question? Yes, you answered it very thoroughly, actually. Thank you. So that, I mean, that being said... Well, why was playing these tapes error? You said that the State did not comply with the trial court's order to redact. That's true. Right. That isn't... That's like a sub-issue. But why, tell me, you know, in the paragraph, why was it error to bring these tapes in? There are two specific things that I believe make it error. One is impeachment on its face is when they say, no, I didn't say that. In every instance of these statements, the witnesses got on the stand and said, yes, I said that. Now, that does not apply across the board to all the statements. You asked for one paragraph answer, and I've already gone well past that, but it's a simplification... It's a long paragraph. Simplification of portions of it. In the second portion of my answer to that question... If I might, I'm sorry, I just lost my train of thought. In the four-prong test, not all of the statements which are then admitted through the video do fundamental damage or do actual damage to the prosecution. It is one of the elements to be considered when admitting those. No, that's not 115-10.1 per se. You're alluding to perhaps some case law interpretation. Cases. Okay, but isn't there also a well-settled body of cases? As I recall, 115-10.1 is pretty broad. It says inconsistency on space, but it's been interpreted as changes in positions, silence in the face of actuations. I mean, it's quote-unquote inconsistent with the testimony of trial. And I think the word inconsistent under the case law, including some Supreme Court cases, are interpreted pretty broadly as to what is inconsistent. That's true, but it's not inconsistent with what's given here because she does say, yes, I said those things. Okay, well, let me ask you this. They get up on the stand and a witness says under 115-10.1, happens all the time, I don't remember saying anything. Now, admittedly, that wouldn't affirmatively damage the State's case in the colloquial term, would it? The witness doesn't say anything and doesn't remember anything. There's no damage. Are you saying under 115-10.1, you can't impeach with the out-of-court statement? Isn't that where 115.10-1 was enacted in the first place? I'm actually not addressing that at all because I believe in this particular case, in every instance, those witnesses got up and said, yes, I said that. It was a lie. Well, if it's a lie, then isn't that inconsistent with the trial testimony? To say they're lying out of court and now they're telling the truth? I guess it depends on how you define the trial testimony. They testified to these things at trial. Her testimony was, yes, I said those things. Yes, it was a lie. This is my testimony now. So is the statement inconsistent with her trial testimony? Not all of it. She said it at trial. Yes, I made those statements. She never says, I'm sorry, I keep saying she, but I should have referred to Dario and Rodgers also. They don't say, I don't remember, which was, if I might specifically question. But the trial testimony and what she said out of court, she's acknowledging she made it, but it was a lie.  She's saying the out-of-court statements were lies, right? Yes. So it's not inconsistent with her version on the stand? She acknowledges saying them, but they're inconsistent with her trial testimony. So then we are admitting the video solely to prop up those statements which benefit the state? I wouldn't read it that way, okay? She's not saying, she's on the stand saying this is what really happened. The state tries to impeach her with her version out of court that's inconsistent with her trial testimony. She says, oh yeah, you're right, I did say that. So that then under your interpretation would preclude the state from following up with impeachment simply because she admits that she's made it out of court. Doesn't the inconsistency part play a role in this? To an extent. Certainly it does. It'd be sort of a neat way of gaming around 115-10.1, wouldn't it? No, yeah, I made that, so therefore you can't play them. Well, the question is what is it impeaching? The trial testimony. If you're using it, impeachment to me, and I'm not an appellate court of justice, impeachment to me is to show that they said something or did something prior which they are now denying. Okay. No, not denying. Inconsistent with. Okay. But what does the video add for the jury in this particular case other than to prop up those statements which are most valuable to the state? And in fact, that's exactly why they go to such great lengths to get these videos in. The statements themselves made to the officers are the evidence. Not the video themselves. Yeah, but you've got this overlapping theme of coercion, don't you? You do, except that none of them allege that the coercion occurs on the tape. They all allege to a person that the coercion occurs prior to the video being started. Okay, but it's part of the whole transaction, okay? It is. But you're saying if somebody says, the state could flip that around, I was beaten before I gave the statement, the state could say, well, obviously, you can see nobody's beaten during the course of this statement, so why get into what happened before? I don't think you can shut it off at that point. I think it's relevant to her demeanor, her statements, how she's conducting herself during statements would be relevant to whether or not she was coerced just moments before, wouldn't it? Certainly portions of it would, yes. And like I said, there's no inquisition as to, hey, why did she throw up? Why is she crying? But it's all there, and they do show that. The question is the value of the statements on the video themselves. What are they adding for the jury as the trier of fact? Are they simply trying to make those statements more credible? Because there's no video, even though the testimony was even at the time, again, taking Ms. Vasquez as an example, at the time that she is being questioned in the Addison Police Department, there are two versions other than the one in which the appellant in this case is the shooter, which are made. But those don't appear on the video. Let me ask you a point of question. Are you aware of any authority that says under 115.10.1, where a witness gets up on the stand, testifies to one version, the state and cross attempts to introduce the out-of-court statements, and the witness says, yes, I made the statement, and they were all lies, the state is precluded from following up under 115.10.1? There'd be no reason to have 115.10.1. I know of no case which precludes them from doing it. I know of several cases which limit their ability to certain factual situations. Okay, all right. I see your point. So what was too far? Too far in this case is that it goes only to prop up one version of events. The state's version? Yes. That even the statements which are made at the police department at the time, which do not support the state's version of events, are not there. The video is selective, and it goes to impeach where there's no impeachment. All right, well, if your first position at trial would have been that the tapes don't come in at all, is your second position that if they came in, they should come in in their entirety to show all of the prior statements? The other statements were not videoed. I didn't ask you that. I mean, that's going to be my follow-up question. I know Ms. Vasquez apparently made statements to the juvenile officer, then she made some statements to a different officer, then they're recorded. But if you have the videotapes, would it be your fallback position that then all of the videos should go in under that? If I'm in a situation where I have a video where all of the statements exist, yes. But that isn't what we have here. Does that color the admissibility of the videotapes, that it isn't the whole statement that each one of these witnesses gave? It's only partial statements? I believe it does color it, yeah. And it goes, certainly, to the credibility. My concern here is what we've done is create a situation where the jury is having the credibility of portions of statements propped up by their existence on video. Should the state be precluded from using videotapes like that if they have not videotaped the entire statement of a witness? Now, be careful what you say is being reported, because we use it against you later. I can certainly drum up fact-specific scenarios in which I would argue that. Well, it either is or it isn't. Either it's the whole statement comes in, or the whole statement doesn't come in. My primary argument to these statements coming in is that they don't actually amount to impeachment. In a situation in which, and this is entirely hypothetical, in this particular case, if those statements existed, if we were going to put in this portion of those statements, then, yes, they should come in. Should a state or an investigative body be required to, when we went through the capital litigation issue, they did not have to come in. They could, in fact, make it a rule. If it's a murder investigation, you videotape the entire thing. Now, I get the workaround here that she was initially brought in as a, I'm sorry, I believe it's truancy or curfew. It was a juvenile-related issue when she first comes in, and it's not until at some point later. So it's your contention that this videotape is videotape of things that are not inconsistent? That is, yes. Some of it is. Some of it is. I mean, I tried to line up in my actual brief without getting into it. Well, what are you objecting to having, then, being presented to the jury? In another way, where I'm coming from is this way. Your argument sounds like this is not inconsistent. Well, if it is not inconsistent, then it's consistent. If it's consistent, is it prior consistent statements? If it's prior consistent statements, is it objectionable? And if it is, did you make it? Did you follow that? Working on it, yes. Do you want me to repeat it? No, I think I got it. You may have to question your gut on it. But in this particular case, when a witness gets up on the stand and said, yes, I said those things, no, they are not true. What you are impeaching, or what the impeachment amounts to at that point, is you're essentially impeaching the statement, no, they are not true. Not whether she said them or not. You're impeaching the trial testimony. If it's a different version she gives on trial, how is the state supposed to show that her trial testimony isn't true without playing the tapes? It certainly would have been cleaner in this case to call the officers. Now we're on a different issue. You want us to announce a ruling that would have been cleaner, therefore the conviction is reversed. No, I understand. I guess my issue here is this. My concern is that we have made the video the testimony. Whereas the evidence is actually the statements they contain. If you have a situation where a witness denies saying something, clearly it's impeachment. The question then becomes, if we play the video where she admits saying them, it all becomes argument at the end. You can argue any reasonable inference. So the state is going to argue, no, when she said this, it's what's true. It's to assess the credibility of the witness in the context of both statements. So what have we done here? We've put the tri-effect in a situation where we've given inherent credibility by the playing of a video to a statement which was denied in court. That's exactly what 11510 was designed to do. It was to prevent people from changing their story. It was. And getting away with it. And it has some parameters, one of which is that they acknowledge that they said it previously, then it's admissible as substantive evidence, not as impeachment. Or not merely as impeachment. So, you know, when you talk about it, whether it's impeaching or not, whether it's inconsistent or not, you're talking somewhat different nuances. One of which is whether or not it's going to be considered as substantive evidence or whether it's not going to be considered as substantive evidence, whether or not it's going to be limited in its scope. True. The other thing that I have a problem with your argument is, if they are making claims on the stand that they were coerced and or battered and or affected in some way, shape or form that their visage would display some evidence or proof of their claims, then it would seem that the videos would not only be testimonial, but they would be demonstrative as well. So is there anything in these videos that would demonstrate either that they were or they weren't? How should I put it? Coerced, duress, assaulted, assaulted, battered, whatever. First, my recollection of the testimony is that none of these three witnesses made any allegations against Addison that they were assaulted, that they were battered in any way. So, no. The complaints of these three particular witnesses were yelling at, banging on the table. Those are the two primary ones made uncomfortable. Well, couldn't it arguably show them being emotionally upset? I mean, there could be some carryover from this coercive atmosphere you allude to. But I have one final question. Okay. The standard, in any event, the standard is abusive discussion, right? Yes. Which means that we would have to overturn it on the basis we find that no reasonable person would have ruled the way the trial court would, correct? That's a fairly high hurdle, isn't it? It is, although in this particular case, the trial court made a ruling about redactions. So we're not, I mean, it just wasn't followed. And was there an objection then at the trial? Yes. Okay. And so what did the trial court do then? They decided they would come in on the evidence that, well, you know. They let them in with fast forwarding. That was, I don't think, complied with the original order for redaction. Okay. And then specifically, what error do you point to by the state's failure to comply with the redaction order? Specifically, the complaint regarding redaction was that there were corollary statements, that there were hours of dead time, that. So, like, more statements than were supposed to come in came in? Yes. Okay. And did you articulate those anywhere? As you. As we went into my brief, yes. And then, and your point is that that is. A portion of the argument. Prejudice. Yes. And that's reversible error. I believe that it all plays into the overall issue there. It's to push on one specific thing is this. I believe in totality the statements are mistaken. In totality, they have a long, they go a long way in the reasonable doubt portion of the argument also. That. We have. Propped up certain evidence as opposed to other evidence. And. Again, if you look at officer's testimony. It was obviously a close run thing. And who got charged and why for this. And. In the end, it came down to. Choosing a set of statements to believe. I believe officer's testimony was. That the people who were in the other car, the second car, the green car or first car, depending on how you look at it. That they seemed believable. That he used some words like seem believable or seemed truthful. Right. I get all that. Excuse me. Your point is that. You did identify specific statements that you objected to. Not that I objected to. Objected to a trial. Yes, there is a long discussion between the court in the state on the day that the redactions were due and the defense attorney. Should not come in. Thank you. Thank you. Thank you. Thank you. May it please the court. Counsel. Good morning. Briefly before I start my argument, I would just like to address the timeline. It seemed like there was some issue in the timeline of whether or not there were redactions, when the statements were played in whole. And I do believe the timeline is important as to what transpired during the course of the trial. During the course of the trial, the state sought to admit Vasquez's statements in their entirety. And I believe that that was fairly soon after Vasquez testified. At that time, there was a discussion on the record, and I believe, if you give me one moment, it begins on page. I believe on page 976 about whether on the record as to whether or not the discussion, the statement should be admitted in their entirety. And at that time, for that witness only, the court determined that it was going to permit the playing of the videotape in their entirety. Because the defense wanted to make reasonable inferences as to coercion and threatening by showing the long periods while the witness was in the room. And the state also wanted to show that the witness was not coercive in those aspects. And in terms of fast-forwarding and not fast-forwarding, as I believe Justice Hudson pointed out, that was agreed to by both parties at the trial court in terms of to move along that statement. It's not as if there were issues where the state was fast-forwarding on its own. So you're representing that the defense at trial agreed with this fast-forwarding as a remedy? I agree, and I believe that begins on the record on page 1041, and they kind of go through fast-forwarding that's on the record on page 1076. As opposed to trying to redact the tape. As in terms of there were some issues of redaction that were discussed in motions and limited pre-trial. I believe that there were some issues with whether or not some things got redacted or not. Those were brought to the court's attention immediately, and the court gave curative instructions to disregard whatever issues were in motions and limited. The second part is that in terms of Daddio and Rogers' statements, there was a discussion. The courts said they were taking it on a witness-by-witness basis. And at that point, the court determined after some discussion between all parties that they were only going to permit the admission of videotaped statements that were inconsistent with the witnesses' statements at trial. At that point, the state filed on, in between the playing of the tapes and that discussion, the state submitted a written memorandum asking the court essentially to reconsider its ruling that the tapes could only be played in part, and instead saying that the tapes could be played in their whole. And that memorandum is on page 1561 of the record where it starts. So there's a little timeline issue. And then after that memorandum of law, the court makes its rulings and says, those states can come in in totem. And again, though, between the- Did the court articulate why, then? The court articulated why. And even in those statements, there was some place forwarding. And again, that was all done in agreement between both parties. Well, what did the state, what did the judge articulate as the reason, then, for allowing the entire thing? Sure. In terms of the judge articulating the statement, the court acknowledged that 115-10.1 has several ways in which evidence is permitted, or admitted, excuse me. And one of those is section C2C, which is the videotape can be admitted as substantive evidence provided that the witness is inconsistent at trial, is subject to cross-examination, has personal knowledge of the statements made at trial. The court found that the videotapes stated as such. And as I believe Justice McLaren stated previously, the court also determined that the tapes went to coercion and threatening, because all three witnesses determined that, or all the witnesses said that they only made these statements based upon the threatening manner, being held forever, being held to all hours of the night. And the videotapes went right into that. 115-10.1 covers the admissibility, not the manner of the evidence. And I would disagree with what opposing counsel had set forth, in that the statements at trial by these witnesses, Vasquez, Daddio, and Rogers, were inconsistent with the statements they made to the police. In that, at trial, they said, I wasn't there. I was with my girlfriend. I was at home with the defendant in Chicago. That was a statement made at trial. The statements, and they said, and they explained away why they made these statements to the police. That is inconsistent with the statement these witnesses made to the police, in that I was there, I saw the shooting happen, and the defendant was the shooter. So the statements were admitted for that purpose, to impeach that testimony and provide substantive evidence. That is exactly right, Your Honor. Once the state showed that it was inconsistent, the witnesses were available for cross-examination. They spoke of issues that were of personal knowledge. Then, at that point, the state was permitted, under Section C2C, to admit the videotaped statements. And it's not the videotape. It's the statements on the videotape that go towards the admissibility of the substantive evidence. The acknowledgment, in terms of whether the statements were acknowledged or not, the state was thorough in showing how inconsistent the statements were, from trial to their statements to the police. Whether or not the statements alone testified to at trial, by the witnesses saying, I acknowledge making these statements, sure, those statements in themselves are admissible under Section C2B in that they were acknowledged at trial. But that does not preclude or render the videotape inadmissible under C2C in that the testimony was inconsistent, they had cross-examination, and they spoke of events that were of personal knowledge. As cited in the case, in the case law in my brief, People v. Harvey, 366LF3D910 from the first district in 2006, discussed where there are instances where substantive evidence comes in under two components of 115-10.1. In Harvey, there were recanting witnesses, and the state, in order to put their prior statements as a substantive evidence, came in under both the grand jury testimony and the court found it was permissible to admit the statements that the witnesses made as well to the police. Therefore, just because you can get it under one doesn't render the other aspect inadmissible. The other part of his argument was, if you could briefly comment on it, he alleged in his argument that the testimony and the evidence was so infirm or inconsistent and weak that it did not establish the guilt of the defendant beyond a reasonable doubt. What's your response to that overarching argument? Sure. Your Honor, defense argument is nothing new that the trial and the jury did not hear in their closing argument. Those are all issues for the jury to decide, for the jury to weigh credibility, for the jury to determine inconsistencies in testimony and things of that nature. And the jury determined that they found that there was enough, that there was evidence beyond reasonable doubt to convict the defendant. But that isn't the end of the inquiry. Otherwise, are you saying that we can't revisit that issue? Otherwise, nobody would ever take an appeal on the issue. No, no. You're exactly right, Your Honor. However, defendant, there was other pieces of evidence that corroborated these witnesses' statements to the police. I believe Rogers makes a statement in the statement to the police that after the shooting happened, he and Daddio were texting back and forth on the way home talking about, I can't believe what had happened. People's Exhibit 41 supports that statement and supports the evidence. And what was 41? I believe that was the text message, I'm blanking on which phone carrier, of Rogers' cell phone, showing Daddio's cell phone number and Rogers' cell phone number. They were texting back and forth. They were texting back and forth, yes. Additionally, Rogers' testimony at trial was that he had made this all up on his own and that he was with his girlfriend, Aristine Williams, the night of the murder. And that would obviously impeach that argument if there's text between the two of them. Right. And not only that, but Aristine Williams testified that she wasn't with the defendant that night. Not the defendant, excuse me, she wasn't with Rogers that night. Ms. Susuno said that? Excuse me? Who said that? Aristine Williams, that was the girlfriend at the time of Rogers, and she testified that she was not with the defendant that night and was not going to be with the defendant that night because she helps her father on a paper route and she would be leaving at 3, 3.30 in the morning. Additionally, there was, I mean, although motive is not necessary to prove, there was motive here. There was clear evidence that the defendant disliked the victim. And I believe on the record on page 902, Vasquez testified of A defective labor conversation or a threatened phone call. Yes. And there was issues, there was issues of, issues of that. These are, again, there's corroborating evidence to support the statements that these witnesses, these three recanting witnesses testified to that support their statements to the police. These statements are substantially similar to each other. Substantially similar, and yet Rogers testified that he made up the statement all on his own. And yet his statement is substantially similar to Daddio's testimony, to Vasquez's testimony. And their credibility is undermined by showing just how, for lack of a better term, comfortable they are at the police station. Vasquez is joking around with the investigators. Daddio and Rogers don't show, you know. Is this on the tapes? This is on the tapes, yes. Additionally, there's testimony as well that Rogers came back to the police station a second time after they had already interviewed him to bring his girlfriend, Aristine Williams, to talk to the police. And Rogers made a second statement. If a defendant, if a witness is so coerced, it seems surprising that he would voluntarily go back to the police and make a second statement. But in terms of reasonable doubt, it's under the Collins standard. Well, if he went back, what did he say? I apologize? Pardon? I'm sorry, I didn't hear what you were saying. If he went back, what did he say? I believe he made further comments as to what transpired the night of the shooting. Were they consistent or inconsistent with his testimony at trial? Well, his testimony at trial is that I was never there, so they're inconsistent. So was that presented as well to the jury? His statement, his second statement, I believe so, yes. However, I'd have to, I'm uncertain if it's in a video. I think it might just be the officer, and I'm not familiar enough to speak. It came in, but you're not sure how it came in? Yes, that's correct. Okay. But again, it's on, the reasonable doubt is under the Collins standard, and that's looking at the evidence and most favorable to the prosecution. And as Your Honor stated, recanting witnesses, if entered as substantive evidence, can be used to support a conviction. And there's motive, and the jury issue determines the credibility. And there's nothing improbable or unsatisfactory regarding their finding of guilt beyond reasonable doubt. If there are no further questions? No. We respectfully ask that this court affirm defendant's conviction and sentence. Thank you. Thank you. Mr. Yetter? Thank you, Your Honor, briefly. I just have a few points that I want to address from counsel's argument. When referencing the discussion about what would and would not come in and the reasons stated therefore, that's actually on page 991 of the brief, and the statement of the court was that he was not going to, the court was not going to order further redactions because it would be difficult and time-consuming. That was on, that particular statement was actually on 995. The argument about what comes in and does not come in starts on 991. In response, let me confront you with this statement from the case of People v. Govia. 299, Illinois appellate third 76. According to the Illinois Supreme Court case of People v. Salazar at 126, Illinois second 424, because I think it bears on the issue, quote, is well settled that although only the inconsistent portions of a prior inconsistent statement are admissible into evidence, supports your argument, the trial court need not make a quantitative or mathematical analysis of whether the entire statement of the witness is inconsistent for the statement to be admissible. I think it bears on what the trial court is saying. The trial court doesn't have to segment every single word and say, well, that can't be because it's not really inconsistent. That's what the Supreme Court is saying. There's got to be a little bit of latitude when you're dealing with a videotape. And generally speaking, from my experience as a trial attorney, I'll tell you what I usually see is I get an order from a court saying, this is what it's going to be, tells the parties to work it out. Right, work it out. And bring back only arguments that you have about other statements. It is not on the trial court to specifically parse the statement. It's on the parties to do it. But I think it's also implying that it's not error if the court doesn't do that. How would a court ever do that? Again, what I have seen from trial judges that I've been in front of is, you guys work this out. And if you have an argument about what is and isn't going to be in the redaction, bring it back to me. That's how trial courts I've been in front of have worked it out. So when counsel says that the defense attorney agreed to speeding it up or not speeding it up, yeah, defense counsel did. Under the aegis of the previous order, which was we're not going to redact any further because it would be difficult and time-consuming. Well, you can see it's sped up through some of the objectionable points. You say 115-10.1 controls the law, not the manner. So if, in fact, it wasn't redacted, but it was sped up through the points that you didn't want or the trial court didn't, trial judge or lawyer didn't want it played in front of the jury, why would that be error if, in fact, it wasn't played? Again, these are very long videos, and there were some things which were out which maybe should have come in under the order, but there are things that are entered or played for the jury. My argument is about what is played for the jury, not about necessarily what isn't played for the jury, because it's what the jury sees that they use in assessing credibility, not necessarily that which they don't see. A couple of other points from argument. Aristine Williams counseled an excellent job of explaining what her direct testimony was to the court. Her cross-examination was, yes, her father worked for the Chicago Tribune at the time and had a paper route. It's not the traditional paper route. It's very large. But she did not actually recall on that night at that time what her work schedule was. Her testimony was, oh, no, I generally worked at that time. And then on cross, she said, I don't recall. And the second statement of Mr. Rogers does not videotape was taken by Officer Brandt. It comes in through his testimony. Were there any things that the defense wanted presented but weren't? Regarding back statements? No, regarding any of them. In other words, was there an objection raised by the defense that some of the redactions should not have been made? The original objection, which, again, begins about 991 in the record, the defense argued that it would be proper to put in portions related to those questions and answers Vasquez didn't remember but improper to allow the video evidence where she acknowledged making statements but told them they were not true. Specifically, then, in that particular argument, they do give examples. I'm sorry, I'm working on what exactly the examples were right at this moment. May I finish? Finish. Thank you. And, again, just as to the issue of corroboration, there's every bit as much corroboration for the alternate theory of the crime presented by the defense, which was that the shooters came from the green car. Maria Marinas' independent statement of what she heard and saw, her personal knowledge that night, does not support the conviction of Vasquez. It supports the conviction of a shooter in the other car. Thank you. Thank you. There's one more case in the call. We'll take a short recess.